```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                                :
                                          Docket #18cv993
TROMBETTA,                            : 1:18-cv-00993-RA-SLC

                    Plaintiff,        :

   - against -                        :

NOVOCIN, et al.,                      : New York, New York
                                        November 23, 2022
                    Defendants.       :

----------------------------------- : REMOTE CONFERENCE
```

                         PROCEEDINGS BEFORE
                 THE HONORABLE SARAH L. CAVE,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:            ANNAMARIE TROMBETTA, PRO SE
                          175 East 96th Street, Apartment 12R
                          New York, New York 10128

For Defendant –           WILSON ELSER MOSKOWITZ EDELMAN &
WorthPoint Corporation:   DICKER, LLP
                          BY:  ADAM BIALEK, ESQ.
                               NICOLE HAIMSON, ESQ.
                          150 East 42nd Street
                          New York, New York 10017

Transcription Service:    Carole Ludwig, *Transcription Services*
                          155 East Fourth Street #3C
                          New York, New York 10009
                          Phone:  (212) 420-0771
                          Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Defendants - Estate        DUFF LAW PLLC
Auctions, Inc. and Novocin:    BY:  ANDERSON DUFF, ESQ.
                               43-10 Crescent Street, Suite 1217
                               Long Island City, New York 11101

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

4

HONORABLE SARAH L. CAVE (THE COURT):  Good morning, this is Magistrate Judge Cave, we're here for a conference in Trombetta versus Novocin --

MS. ANNAMARIE TROMBETTA (THE PLAINTIFF):  Good morning.

THE COURT:  (continuing) -- case number 18cv993. Good morning, Ms. Trombetta?

THE PLAINTIFF:  Yes, good morning.

THE COURT:  All right, good morning. And for defendants, let's start with the Novocin.

MR. ANDERSON DUFF: Your Honor, this is Anderson Duff appearing on behalf of defendants Estate Auctions and Norb and Marie Novocin, thank you.

THE COURT:  Great, good morning.  And for WorthPoint?

MS. NICOLE HAIMSON:  Nicole Haimson with my colleague, Adam Bialek from Wilson Elser on behalf of WorthPoint Corporation.

THE COURT:  Okay, good morning, and apologies for the delay, my prior conference was trying to fit a lot in before the holiday so I had a lot of issues with the other parties so thank you all for being flexible about the time that we're getting started today.

Okay, so, you know, I have a few letters from the parties and I've been trying very hard to sort of discern what remains. I did get a couple of additional letters from the parties last night and so it seems to me, Ms. Trombetta, that one of the big issues that you were focused on in terms of the productions from the defendants was the complete sales receipt from the eBay auction of the 1972 original oil painting. It seemed like from Mr. Bialek's letter that that complete receipt has now been provided to you, is that the case, Ms. Trombetta?

THE PLAINTIFF:  It has, I did state that in the November 16th letter that you had requested of me, however, I think it's important as I put in my letter on Monday that the original message or the wrong message, which is the coding for that email, be produced and the reason for my request is that usually with all eBay receipts there is an icon of a square, it almost looks like an old fashioned slide, and the receipts from 2012 from EAI or eBay is absent of that particular icon.

THE COURT:  Okay, so --

THE PLAINTIFF:  So why reason for the raw data or the original email, which will have the content in

6

that receipt as well as the coding for it, and it will just validate that the receipt transference was done. I have --

THE COURT:  What you have now is just like a PDF version of that receipt?

THE PLAINTIFF:  That is correct, Your Honor -- (interposing) --

THE COURT:  Hold on, everybody will have a chance to talk, please wait until I call on you.  Go ahead, Ms. Trombetta.

THE PLAINTIFF:  Yeah, thank you.  So the defendants, WorthPoint, in particular, requested of me several of those type of printouts. So not only did I print out the PDF, you know, the content, text content, but I also printed out the raw message or the original message which gives you all the text within the tracking and the coding of that email.

THE COURT:  Okay, are you concerned about, that the PDF is somehow not authentic?

THE PLAINTIFF:  The production of the original message will validate and verify that conclusively. I am just, I just noticed that in all of my eBay documents there's the icon of the gray square where the image should be and it usually says, you know,

7

click on to view image.  But I did not see that in the PDF.  And, again, since that was asked of me and I understand why, then I just would like --

THE COURT:  There's no dispute that the eBay sale took place, right, that's not disputed?

THE PLAINTIFF:  Again, the verification of the original or the raw coding and email will conclusively validate that.  All I can tell you with most certainty is that I did not paint this image, I have produced my signature --

THE COURT:  I know.

THE PLAINTIFF:  And I've also cooperated to an extended amount. I had nothing to do with this.

THE COURT:  I know, and that goes to the merits of this case, so let me hear from --

MS. HAIMSON:  Your Honor, may I clarify quick, (indiscernible) was requested in terms of the actual email. So I think plaintiff just explained to the Court that counsel for WorthPoint had requested printouts of emails and that she was seeking basically the equivalent. That's actually inaccurate, what we have requested was essentially the native electronic format of that email which was exactly what we just sent her.  We sent her the native electronic format of

8

that sales receipt. So she has exactly what we are requesting from her and I don't know what she's talking about when she's saying coding, but we have given her the native electronic format of that email. So I don't think there's really anything else to give.

THE COURT:  Okay. All right, so, Ms. Trombetta, do you have -- Mr. Duff?

MR. DUFF:  Yes, Your Honor, I just wanted to address this very briefly since this was our production, my client's production.  The email that she's talking about, we originally produced in April, April 26th, and it was converted into a PDF and stamped. During the deposition of my clients, WorthPoint's counsel correctly pointed out that there were a few digits that were cut off when it was converted to a PDF on the right-hand side.  So while the deposition was happening, I forwarded the raw email, the .eml file, which contains all the metadata, is unstamped, has everything that Ms. Trombetta could want, that was on September 21st.  So she's had it since September 21st and she's continued to file these letters with the Court saying that she doesn't have it. And I know that everybody got the email because Adam Bialek recently, as counsel just stated,

9

recirculated that file. Ms. Trombetta's had this since the raw file, since September 21st, and just to address Ms. Trombetta's concerns I went ahead and reproduced it, restamped it as a PDF that does not cut off an of the information on the right-hand side.  So Ms. Trombetta's had this since April.

THE COURT:  Okay. All right, Ms. Trombetta, do you now have the emails?

THE PLAINTIFF:  In my letter that I wrote yesterday or maybe the day before, I gave and produced -- no, it was yesterday, examples of what it was that I was looking for.  And I had also stated that in the email that was sent from Adam Bialek, when I clicked onto the attachment, the attachment activated my mailbox on the computer, and a drop down menu came up where you have to select either Gmail, Yahoo, whatever. I don't have that system operating. If Mr. Duff sends me the coding of the PDF I would appreciate it if he'd send it to the outlook.com. I cannot open what it is that he, that Mr. Bialek sent.

Now I have been asking repeatedly for the full uncut version of the PDF on numerous occasions --

THE COURT:  He said he sent it to you on September 21st, Ms. Trombetta.

10

THE PLAINTIFF:  Yes, but on October 31st I sent Mr., well I put this in my letter, on the 29th I sent, which was a Saturday, I sent a sample of the April version of the PDF which was slightly truncated. Then I also sent the deposition pages 74 to 79 of my Mr. Novocin which states that he keeps all his emails. Another thing that I'm requesting is the transaction of the payment.  Third, any type of receipt from the buyer which is still missing.  This is just basic --

THE COURT:  Okay, well it seems to me, Ms. Trombetta, that the defendants have produced to you in several different formats a copy of the receipt that you're asking for and I'm not going to require them to produce anything --

THE PLAINTIFF:  Your Honor, I have to disagree.  They produced in April the cut, truncated PDF, it's just the printout of the email --

THE COURT:  And then he --

THE PLAINTIFF:  What I'm requesting physically is the, I have received the full PDF but not the original and raw message of that particular email.

THE COURT:  He just said --

THE PLAINTIFF:  Secondly, there is no --

THE COURT:  Ms. Trombetta, you have to listen

11

to me.  He sent it on September 21st.

THE PLAINTIFF:  That's what they are saying and I'm telling you that the email that they sent the other day I could not open it. I will send it to another person, I plan on doing that over the weekend, to see if they can open it, but I, personally, cannot open it.

THE COURT:  Okay --

THE PLAINTIFF:  They can actually print out all the data, that entire raw message, and scan it and send it to me.

MR. BIALEK:  Your Honor, if I can, this is Adam Bialek, I just want, I just want to say I sent I to two different email addresses for Ms. Trombetta, I sent it to the annatrombettalegal@outlook.com and then I also sent it to atrombettaart@gmail.com.  So it would have gone to two different servers.

THE COURT:  And that was attaching the native document, correct?

MR. BIALEK:  That attached the email that I had gotten from Mr. Duff which was, it looks like a January 10, 2017, mail form eBay@novocin.com to Norb Novocin and Marie Novocin that it forwards the December 1, 2012, at 9:54 p.m. email from eBay at

12

eBay.com to eBay@novocin.com, and that has, that's the original email that they have which has all of the sales price and the buyer's name, buyer's shipping address, et cetera.

THE PLAINTIFF:  The buyer has not produced any receipts of the transaction of payment, nor have they indicated was it paid by check, PayPal, cash, credit card, that hasn't been produced nor the sales receipt. There's only one document that's been produced and, again, I am asking you, Judge Cave, to have the defendants print out the data and send it to me that way.

THE COURT:  What data?

THE PLAINTIFF:  That's what I did in my --

THE COURT:  Ms. Trombetta --

THE PLAINTIFF:  (continuing) -- responses, I printed out, I was requested to print out the February 20, 2016, email. I printed out the text, the actual email, then I went to the raw message and print out most of the coding. And then after the October 28th meet and confer I figured out a way to export the raw message into a PDF file and I forwarded that to both defendants as requested. I'm just asking for the same type of consideration as I am extending to the

13

defendants.

THE COURT:  Is that your exhibit 4 to your letter yesterday, is that the type of raw data that you're talking about?

THE PLAINTIFF:  Correct, thank you, Your Honor, that's precisely what it is that I'm looking for. I printed out an example of the hard copy which is basically any time you open up an email you get the text or the, you know, the look of the email.

THE COURT:  Why do you need the data for this email?

THE PLAINTIFF:  As stated earlier, first and foremost there should be on the PDF an icon of the image in gray where it's highlighted on blue and it says click onto the image.  It doesn't have that. Secondly, it's as requested of me as proof this is another verification that the sale took place.  The whole case is hinged upon the importance of the proof of the sale because that's how WorthPoint became involved.

THE COURT:  All right, stop talking for a minute please so I can ask the defendants a question. Ms. Haimson or, well actually let me ask Mr. Duff because I think this is your email --

14

MR. DUFF:  Yes, Your Honor.

THE COURT:  Are you able to ascertain the data for the email comparable to what appears in exhibit 4 to Ms. Trombetta's letter yesterday?

MR. DUFF:  Your Honor, just to be frank, I have no idea what she means when she says raw data. To the extent she is talking about the email headers which is what you can derive from the raw file which she's had, again, since September 21st, I'm happy to I guess convert to a PDF the email headers which she could do and has been able to do since September. But I'm happy to do that and circulate it.  I just want to quickly address the --

THE COURT:  I think it's something different, Mr. Duff, to be candid, I think -- I think what she's talking about is the metadata for the email and I realize that as a layperson, and I don't know the first thing about this either, but do you have someone in your office who could extract the metadata for the email and then produce it basically like in a PDF?

MR. DUFF:  Your Honor, I'm not, I guess I'm not sure what that, what that means, but to the extent that I can I'm happy to do that. I mean we sent her the raw file that contains all of that --

15

THE COURT:  I know.

MR. DUFF:  So if she knows how to do it, she should be able to do it.

THE COURT:  She's not able to open the raw email --

MR. DUFF:  Well, Your Honor --

THE COURT:  Go ahead.

MR. DUFF:  I'm sorry, Your Honor, go ahead.

THE COURT:  It's all right, go ahead.

MR. DUFF:  Well with respect, she did say that when she tried to open the raw file the mail program started opening, well that's how you open the file, that indicates that she can open the file because it is a mail app file. So if the mail app started opening she can open the file.  But because, just that she doesn't know how to do it doesn't mean she can't.

THE COURT:  Right.

MR. DUFF:  But to the extent that she will, if she can explain to me the steps I need to take to turn a PDF, give her a PDF that will resolve this issue for her, I'm happy to do that, even --

THE COURT:  What I'd like you to do, so, obviously there is going to be, all I'm, the reason to make a big deal about this is this is obviously a

16

seminal document in this case and the authenticity of

the sales receipt is going to be something that, you

know, maybe you're going to be able to agree, but

maybe not. And so the authenticity of the document is

important.

MR. DUFF:  Sure.

THE COURT:  And what I'm interpreting Ms.

Trombetta to be saying is she wants to confirm that

the PDF and the raw email that was sent to her are, in

fact, the actual authentic documents.  And so if you

look at exhibit 4 to her letter yesterday, which is

ECF number 317, it's a bunch of garbled characters

that make no sense to me but I am sure to an IT person

they'll say, yes, this is the metadata for an email.

And so --

MR. DUFF:  Your Honor, this is the -- and I'm

sorry.  I'm sorry, go ahead, I did not mean to

interrupt.

THE COURT:  Sorry, what I'm just trying to get

at is that for the raw email that you provided to her,

to extract the metadata for that email and produce

that to her as a, like a PDF similar to exhibit 4 to

her letter --

MR. DUFF:  Yes.  So, Your Honor, I'm looking

17

at exhibit 4 right now, that is -- that is the email headers, that's what I was talking about earlier.

THE COURT:  Okay.

MR. DUFF:  So that I know how to produce, I'm happy to do that, I can do that from the (indiscernible) EML file that we've already given her, I can do that immediately after this conference and I will do that and then hopefully we can put that to bed.

I would like to address one more point that Ms. Trombetta (indiscernible), plaintiff said that we have not produced documents, the sales receipts that the buyer has.  Well why would, we don't have documents that the buyer has and we can't produce things, we told her many, many times that we cannot produce documents that either do not exist or that are not within our possession, custody or control, those documents are not within our possession, custody and control, and we would have been able to explain that to her, at least try to explain that, had Ms. Trombetta met and conferred with us which she has consistently refused to do. In fact, last Thursday WorthPoint's counsel asked Ms. Trombetta if she would meet and confer with us on Monday of this week to try

18

to resolve some of these issues so that we wouldn't be wasting so much of the Court's time. Well, Ms. Trombetta responded and said that she couldn't possibly meet any time on Monday but then Monday morning she filed a two page, single spaced letter with the Court, so obviously she had time, she just wasn't willing to meet and confer. And that's just the most recent and one example, one tiny example of the continued bad faith with which Ms. Trombetta is proceeding in this case. And that's all I have to say about that, but I'll happy produce a PDF of the email header for this crucial email.  Thank you.

THE COURT:  Thank you, okay.

MR. BIALEK:  Your Honor, if I may --

THE COURT:  Let me just say I read all of your letters. I understand that there is a depth of loathing between the parties here that is almost immeasurable, and I understand that the parties are equally frustrated with where we are in the case. All I care about is getting you to the end of discovery. I'm not, I don't care about who shot John, I don't care about who behaved worse, if and when there is an appropriate time for the defendants' attorneys to be seeking sanctions or (indiscernible), we will address

19

that. In the meantime, it's not necessary and it is a waste of my time for the parties to be belying each other in writing and letters to me and during conferences with the Court.  Today we are talking about what, if there are any remaining categories of documents that either party thinks the other party has and needs to be produced, that's what we're talking about today.

So, Ms. --

MR. DUFF:  My apologies, Your Honor, thank you.

THE COURT:  It's not necessary to apologize, I just needed to level set the conversation.

MR. BIALEK:  Your Honor, may I --

THE COURT:  Go ahead.

MR. BIALEK:  Sorry. I just wanted to say that I just am sending over to everybody the header information or the source information that was pulled from the email. But to avoid having to come back for another conference, I just want to point out the email that Mr. Duff had sent to us was actually forwarding the original email. So the email that he sent was from 2017 and it came from the Novocin's eBay@novocin.com, they had kind of forwarded the email that

20

eBay@eBay.com had sent to them.

So while I just forwarded the source information that she's looking, that Ms. Trombetta is looking for, it's not going to have the source information from that December 1, 2012, email, it would only have it from 2017. So I just want to make sure that everybody is aware of that so we don't have to have another fight over it.

THE COURT:  Okay.  All right, thank you for that clarification. All right, so one way or another, Ms. Trombetta, whether it's from Mr. Bialek momentarily, or from Mr. Duff after this call, you are going to get the information about the eBay sales receipt email that we were just discussing.

THE PLAINTIFF:  Okay, Your Honor, if I may just say three things.  First and foremost, my letter on Monday was filed on Friday evening. Any letters that I wrote that were filed yesterday were written over the weekend. I did, as stated, had appointments, it's a holiday week, I had a lot of things to do.

That said, I will go to my Gmail account and if you go, if the email was sent from Gmail you go to the arrow, there's a circle with three dots and it says reply, forward, filter message, you click on show

21

original and when you click on that what you get is message ID created at, which gives you the date, from/to/subject.  Underneath that you get the text of the email and all the coding that goes with it depending on how long the email is.

If it's a Yahoo account, then you go to the email, you go to more, you drop down the window and it says raw message. Now when WorthPoint asked me for the metadata, I didn't know how to produce it. But then I went to file, drop down window export PDF, and lo' and behold, it did it, it brought it to my desktop. This is what I put in my filing yesterday. Again, it's a printout of the original email which is what I have from Estate Auctions Inc. in full.

Again, in the spring of April it was truncated, on September 21st it was brought to the Novocins' attention, if Mr. Duff did, in fact, include the original or the raw message, it depends on the email platform.  Each email platform, Gmail, Outlook, they all have a different system but they all are consistent with being able to reveal and either print out or export to a desktop the original message with the coding and the text of the message.  Thank you.

THE COURT:  Okay.  Are there any other

22

categories of documents, Ms. Trombetta, that you have requested and you think the defendants have not produced that we need to discuss today?

THE PLAINTIFF:  Thank you, yes, it is not the receipt from the buyer that I'm seeking, and I'm trying not to mention her name.  But when something is purchased there's a transaction. I'm asking for how the buyer paid for, there had to have been some kind of transaction, either a check or PayPal or cash that occurred either electronically or by mail. This is the second thing that I'm seeking, the transaction, the monetary transaction proof.

The third is --

THE COURT:  Let's just stop --

THE PLAINTIFF:  When I purchase something at the supermarket --

THE COURT:  Please, Ms. Trombetta -- Ms. Trombetta, when I talk you need to stop talking. Let's talk about that one first. But the transaction took place on eBay, right?

THE PLAINTIFF:  I don't know.  When I bought something off of eBay I used PayPal in order to pay for that.

THE COURT:  Okay, so eBay knows the answer to

23

that question, right?

THE PLAINTIFF:  I have contacted eBay but since they received the funds, they meaning Estate Auctions Inc., since they received the funds they should have a document of payment of how the monetary transaction took place.  I know I do when I --

THE COURT:  Let me ask Mr. Duff.  Mr. Duff, do you have any information about how EAI received the payment for the painting?

MR. DUFF:  Your Honor, not at this moment, we were not aware until plaintiff's recently filing that she was so concerned with that.

THE COURT:  Okay.

MR. DUFF:  We also think that it's irrelevant to the claims in this proceeding. We will stipulate that my clients received payment. There's no dispute about whether my clients received payment --

THE COURT:  I know.

MR. DUFF:  (continuing) -- for this.

THE COURT:  All right, so --

THE PLAINTIFF:  There's no proof.

THE COURT:  (continuing) -- Ms. Trombetta, will you accept that there's no dispute that the sale took place and that EAI and the Novocins received

24

payment for the painting.

THE PLAINTIFF:  I -- I am requesting proof of how the payment transacted.

THE COURT:  Why does it matter?

THE PLAINTIFF:  Because, again, the whole purpose for WorthPoint advertising this painting was to broadcast the sale and the sales record.  That supposedly is WorthPoint's --

THE COURT:  Right, they're not disputing that the sale took place.  So why does it matter what form --

THE PLAINTIFF:  I'm disputing, absent the verification of proof, whether this sale actually took place in 2012. And a receipt for the painting is not a tall ask. I have produced 700, over 750 documents in proof to answer the most expanded extraneous questions, and I fulfilled every request. Again, the backbone of this case is for the sale of a painting that I did not do that was attributed to me. So to ask for a receipt of the monetary transaction of how the buyer bought the painting, I really think this is not only significant but a vital component to the records --

THE COURT:  Mr. Duff do you --

25

THE PLAINTIFF:  (continuing) -- have one piece of evidence that they've produced. And, again, it hasn't been verified through the raw or original message.  Thank you, Your Honor.

THE COURT:  All right, Mr. Duff, do you have a way to check and see how EAI received payment for the sale, would there be something between eBay and EAI that would show this or something in EAI's bank account from 2012?

MR. DUFF:  Your Honor, again, we would object to the production of this material but I'm happy to talk to my clients and if there, if they do have a document and, again, this is going back, I mean almost a decade I think, if my clients do have some kind of additional receipt, we'd be happy to produce it to the extent that it doesn't, you know, we'd want to redact confidential information. But I'll ask my clients, I don't know that they do. The reason that the email was forwarded to my client from an old account is that my client was losing access to the account that all these emails had originally been sent to and he was forwarding them to himself to preserve them. So I don't know that they actually even have access to this information anymore because of the length of time that

26

has elapsed, but I'm happy to ask.

THE COURT:  I understand and there may be, I'm not on eBay, I don't know what your account looks like at eBay, but there may be some account history or something that may show --

MR. DUFF:  Sure.

THE COURT:  You know, I don't remember the price of the painting, but that dollar amount coming in.

MR. DUFF:  It's $181.50, I think. And I will talk to my clients, if we have that, if my clients have that, but I guess we're happy to produce it if it means we will not hear about this issue again.

THE COURT:  Okay. All right, thank you.  All right, Ms. Trombetta, what else?

THE PLAINTIFF:  I, for EAI let me just -- I wanted, I was requesting the WorthPoint membership. So during the deposition Norb Novocin on September 21st stated that he was a member of WorthPoint and I requested the years and the written proof of membership.

THE COURT:  Okay.

MR. DUFF:  Your Honor, she --

THE COURT:  Okay, sorry.

27

THE PLAINTIFF:  Yeah, that was actually in February of 2020, request number 25 was all and any memberships between EAI and WorthPoint, that was never granted.

THE COURT:  Okay, let me Duff respond.

THE PLAINTIFF:  Thank you.

THE COURT:  Mr. Duff?

MR. DUFF:  Your Honor, I believe that those were, that information's requested in an interrogatory to which we have responded. And also we have --

THE PLAINTIFF:  (indiscernible) as well.

THE COURT:  One at a time, please, everybody will have a chance to talk but it's going to be a mess if everybody is talking over each other. So, Mr. Duff, you finish.

MR. DUFF:  Yeah, Your Honor, I'm not sure that there is any, I don't believe that my clients have any, I mean I'm not really sure what plaintiff's looking for here but there's no dispute that my clients have been members unless plaintiff is for some reason disputing that my clients have been a member of WorthPoint. I believe that we have produced documents, I don't have them right in front of me, but I believe that we have produced information, emails to that

28

effect, I don't have them in front of me, but my client has testified that they've been members and WorthPoint is not contesting that WorthPoint has also produced information showing that my client has been a member of WorthPoint during those years.

THE COURT:  Okay, Ms. Haimson, do you recall what you produced showing the Novocins' membership?

MS. HAIMSON:  Again, as Mr. Duff communicated to the Court, this was in response to a request for an interrogatory and we provided the dates of his paid subscription, of Mr. Novocin's paid subscription to WorthPoint, I confirmed that he's still a subscriber.

THE COURT:  Okay.  But do you have something like, is there like an account statement or some other form showing that he's a member?

MS. HAIMSON:  I'll confirm before the conference is over in terms of what we produced. I don't, I don't know offhand if we produced any documents, I don't believe they were requested, I think it was just information that was requested.

THE COURT:  Okay.  Well --

MS. HAIMSON:  But, again, as Mr. Duff said, I'd be happy to confirm if we have those in email.

THE COURT:  What I'm interpreting her to be

29

doing is to be making a post deposition document request and so I realize that there may not have been a prior request but in deference to Ms. Trombetta's pro se status I'm interpreting what she's doing as to be a follow-up document request to deposition testimony.  And so that's why I'm asking the defendants, notwithstanding that there may not have been some prior written RFP, to be checking for these documents.

        Okay, what else, Ms. Trombetta?

        THE PLAINTIFF:  Thank you, Your Honor.  Before I continue, let me say this, I did send a subpoena to Ask Art and they produced the dates and the years that Mr. Novocin was, for his membership, and he's currently a member.  That's what I'm seeking from WorthPoint and Estate Auctions Inc., just as you very succinctly and clearly requested, I'm requesting the same, written proof. If they give me WP0074, fine, but I have reviewed WorthPoint's documents, evidence, and I've also reviewed EAI and neither one has produced my request which was made.

        THE COURT:  They just said they were going to go look for it, so what's the next thing on your list?

        THE PLAINTIFF:  Very good.  The next thing is

30

the 2012 tax records for EAI for this year of the sale.  And also the name of the computer servers, programs that they used in 2012.  One of the reasons when I spoke to them in 2017 and during the deposition they said that they switched servers or they moved servers and they lost all their data. So to know the name of the server or the program, I can forward this on to the expert witness and in hopes of -- I think I have an incoming call so pardon that sound, that's another thing, question from Estate Auctions --

THE COURT:  Why do you need the tax return?

THE PLAINTIFF:  Just proof of if that is registered, that sale was registered for that particular year.

THE COURT:  Why would that be on the tax return?

THE PLAINTIFF:  It's a way of seeing how much they made during that particular year.

THE COURT:  But that's the sort of global figure, it's not going to -- anyway, they've provided you the receipt, they're going to provide you with the raw data for the email, that's sufficient, so your request for the 2012 tax returns is denied.

THE PLAINTIFF:  Understood.

31

THE COURT:  Why do you need the server, what difference does the server name make?

THE PLAINTIFF:  The server, just to possibly do research on what kind of programs they were using because they said that they lost this data.

THE COURT:  So they said they lost it and so they lost it, why does the server, the name of the server make a difference?

THE PLAINTIFF:  I would have to pose that question specifically to the expert witness, but nonetheless, it would be like asking did the email come from Gmail or did it come from Yahoo, there are particular programs in place at particular times, like an Apple computer, an Apple computer, you know, what model is it, it's an OS 10.2. It gives a particular, to the layperson it's not as informative but to the expert witness, they can hone in on the specifics of the program, that's the most articulate way that I can formulate an answer to your question, Your Honor.

THE COURT:  Well the request for the information about the computer server is denied.  You haven't shown me that that's in any way relevant to any of the issues in dispute in this case.

THE PLAINTIFF:  Well basically, they're saying

32

that they lost the data and they lost it --

THE COURT:  Ms. Trombetta, I made my ruling, is there anything else on your list?

THE PLAINTIFF:  For Estate Auctions Inc. at this point, no, it's important to get the means of payment.

THE COURT:  Okay.  Anything for WorthPoint?

THE PLAINTIFF:  Yes, WorthPoint I'm asking for the unemployment, proof of unemployment records for Gregory Watkins and Anita Brooks, these are the two people that I dealt with in trying, particularly Ms. Brooks, in August through November she kept telling me that WorthPoint wasn't responsible for the posting. Secondly, when I spoke to her in January of 2016, there was no progress, I had to keep calling her again. And, of course, the other person, not only do I want the unemployment, proof of termination basically, so when they were terminated.

Secondly, if it's possible to get the addresses of these people to see if I can contact them. I had asked for that --

THE COURT:  Okay, stop, stop --

THE PLAINTIFF:  (continuing) -- meet and confer in February.

33

THE COURT:  Stop, please, let Ms. Haimson respond.

MS. HAIMSON:  Sure, thank you, Your Honor.  So we've provided employment information. There was never any previous or prior request for proof of employment dates we did submit in response to plaintiff's request for interrogatories employment dates and explained exactly when these two individuals were terminated by WorthPoint and when they, as of when they no longer have been employed by WorthPoint. This is not an employment case, the reason for them no longer being employed is completely irrelevant.  Plaintiff did not list these individuals as witnesses that were relevant and needed for trial, nor did we.  There is no justification at this point for these requests.

THE COURT:  Do you --

THE PLAINTIFF:  Your Honor, can I --

THE COURT:  Hold on, they're no longer employed by you, do you still represent them for purposes of this case?

MS. HAIMSON:  I don't know if a decision has been made one way or the other in terms of that but I believe the answer is no.

THE COURT:  Okay.  All right, so if there any

34

reason why you can't provide her with the addresses, the contact information for those two?

MS. HAIMSON:  We can provide last known addresses that we have on file, sure.  Again, we're not sure if those are current and if those are, you know, that's something that can flesh out but, yes, we are willing to provide their last known address.

THE COURT:  That's all you can do is the last known address, okay.  So, Ms. Trombetta, they'll provide you with the last known address but you already have in the response to an interrogatory the dates of their employment so that's sufficient, okay?

THE PLAINTIFF:  Your Honor, the dates are in, particularly for Mr. Watkins, his LinkedIn account states that he's still employed at WorthPoint, and I understand if he didn't update or change the information. That is the basis and the reason for the request, they made a particular date and, again, as a pro se litigant, not to -- not to fall back on that, but I did ask for the dates thinking that the implication of proof would be provided to me. And I've, I have asked repeatedly because of the recent finding with the LinkedIn, that's what I put in my most recent letter on this particular subject.

35

THE COURT:  But what's controlling is what WorthPoint says about their employment, not LinkedIn. LinkedIn is not a party, LinkedIn didn't employ them, so that's not controlling. What is controlling is evidence that's produced in this case and that's what WorthPoint has said about when they were employed. Do you have those dates and I'm not going to require them to produce anything further.

THE PLAINTIFF:  Without verification how do I know if LinkedIn is --

THE COURT:  They said it --

THE PLAINTIFF:  (continuing) -- if he's still employed there?

THE COURT:  It's a fact, they've said it and it's a fact that those are their dates of employment, that's evidence in this case. and interrogatory response, Ms. Trombetta, is evidence in the case. You may use that as a fact, you don't need to verify it, they've represented to you that it is the truth and you can use it in the case as those are the dates of their employment.

THE PLAINTIFF:  Understood.

THE COURT:  All right, anything else for WorthPoint?

36

THE PLAINTIFF:  The February 20, 2016, email and the raw or original message, they had requested this of me, I am requesting it of them for one specific reason. We're at the crossroads or in direct opposition to whether the attachments within this email can be opened. WorthPoint claims that they cannot open those attachments yet in one of their pieces of evidence it's photos of my evidence is visible. I, on the other hand, have videotaped me being able to download, open and preview all the attachments. I've also in my deposition responses, I have provided the -- let me get the number, from 351 until 350, I think it's 359, no, that's January 22nd, hold on one second, I have a plethora of --

THE COURT:  While you're looking at that, Ms. Haimson, I have, I have to move on, I have other matters I need to handle today and we're almost at an hour so, Ms. Haimson, the February 20, 2016, email in native format, do you have that and can you produce it?

MS. HAIMSON:  That's actually a request that we made of plaintiff, that's an email from her that originated from her and the issue was that we were having trouble getting a good enough quality,

37

basically a copy of the attachments.  So we requested the raw native format of that email just as we discussed earlier this morning.

THE COURT:  Okay.

MS. HAIMSON:  I don't know why she's requesting it from us, this is a discovery demand that we've made to her, that's featured in our letters.

THE COURT:  Okay. All right --

THE PLAINTIFF:  I'm requesting it because they're stating that they can't open the attachments and I can. So there's a contradiction in that fact.

THE COURT:  Well but just earlier in the call, earlier in this call, Ms. Trombetta, there was an email that you said you couldn't open and I took your word for it.  I'm going to do the same thing in fairness to them and say that they can't open it. And so what they're doing is they're asking you to produce it in native format to them, can you do that?

THE PLAINTIFF:  I've already done it, Your Honor.

THE COURT:  You gave them the native format of the email?

MS. HAIMSON:  You produced a PDF version, you have not produced the native format.  We had discussed

38

you potentially downloading the email, so I think Mr. Duff communicated to you earlier that he downloaded the .eml format of the email that was sent around. We're requesting the same, it's the actual native format of the email that we're requesting, not a printout or not a PDF.

THE PLAINTIFF:  So the, what I have produced --

THE COURT:  Just forward it, that's what they're asking you to do.

THE PLAINTIFF:  I will forward it to them, I've also videotaped me being able to open, I'm going to send that --

THE COURT:  I totally believe you that you're able to open it, but they're not, and so they're asking you to forward the native version, just like what we talked about at the beginning of this call, I'm asking them to do for you about the receipt. So fair is fair and it's great that you're able to open it, but they're not. So because of that, you need to forward them the email in the native version, not as a PDF, not as a photograph, nothing else, just forward the actual email --

THE PLAINTIFF:  Because there is a discrepancy

39

on whether they can open it or not.  I did speak to the computer expert and in forwarding it, because it's old I am concerned that the attachments may not be able to open, hence the reason why I videotaped it. So I'm going to send the videotaped version where I can open it. If I can cc you, that would be great --

THE COURT:  No, no --

THE PLAINTIFF:  If not, I will cc the expert witness --

THE COURT:  No, do not --

THE PLAINTIFF:  (continuing) -- and other people along with forwarding the email, is that okay.

THE COURT:  Do not copy the Court on that email, no.

THE PLAINTIFF:  Understood.

THE COURT:  All right, anything else for WorthPoint?

THE PLAINTIFF:  Hold on one second.  Yeah, I had, just to recap, the last known contact information, that's addresses and phone numbers, of the WorthPoint hard copy membership records, the raw message of the February 20th email and, again, those were my only five things.

THE COURT:  You're the one who is required to

40

produce that to them, not the other way around.

THE PLAINTIFF:  I'm just reiterating all my requests, Your Honor.

THE COURT:  All right, I just want to clarify that's something that you're required to produce to them is the February 20th email in native format.

THE PLAINTIFF:  Twentieth, 2-0.

THE COURT:  That's what I said, February 20th.

THE PLAINTIFF:  Yeah, I'm just clarifying.

THE COURT:  All right. Okay, so, Mr. Duff, are there any issues about the plaintiff's document productions that we need to address today?

MR. DUFF:  Your Honor, no.  No, Your Honor.

THE COURT:  All right, Ms. Haimson?

MS. HAIMSON:  Thank you, Your Honor.  First I just want to clarify, during today's call plaintiff has made reference to a computer expert, I just want to make sure she's aware and maybe you can confirm same that, you know, to the extent that she retains any experts, any computer experts, that she is required to disclose those in accordance with the most recent discovery order that you've set forth. This is the first that we're hearing that she's retained any such type of expert.

41

THE COURT:  If she's going to use them in the -- yes, if they're going to offer a report and they're going to appear in the case then, yes, but if she's consulting with somebody about how to open emails and that kind of thing, then, no, she doesn't.

THE PLAINTIFF:  Your Honor --

MS. HAIMSON:  Thank you for the clarification, Your Honor.

THE COURT:  Go ahead, Ms. Trombetta.

THE PLAINTIFF:  Yes, I have three fact witnesses and to date I have three expert witnesses who are waiting in the wings. So that's who I'm referring to as the computer experts. So they have been named.

THE COURT:  Okay, well expert disclosures are due on December 12th, that's when you have to provide to the defendants all the information about the expert that the rules require.

THE PLAINTIFF:  I've already sent the resumes for the expert witnesses a few months ago.

THE COURT:  All right, well you need to look at Rule 26 which talks about expert disclosures, and that tells you the information about the experts that needs to be disclosed.  You need to comply with those

42

requirements even though you're a pro se plaintiff. Just forwarding their resumes is not sufficient.

THE PLAINTIFF:  Understood.

THE COURT:  Okay.  All right, Ms. Haimson, what else is on your list?

MS. HAIMSON:  Thank you.  So I think in our letter to the Court dated November 7th we sort of outlined what our various objections and responses were. I don't know that we need to address every single one of them --

THE COURT:  Let me just say categorically I'm not going to require Ms. Trombetta to go back and label which documents she's produced and how it corresponds to the defendants' requests. I think as a pro se plaintiff that's unduly burdensome for her. To the extent that there are, you know, missing pages or those types of things, I'm hoping that I don't need to go over all that with you today, that that can be done between the parties, but if you need my assistance doing that then I will do my best.

MS. HAIMSON:  Thank you.  And I think we've tried to go back and forth and she is maintaining, my understanding is that she is maintaining that she's produced everything.  You know, to the extent that she

43

tries to admit or use any of these documents that have not been produced in full, I mean we're going to seek to preclude them so --

THE COURT:  That's --

MS. HAIMSON:  I would -- I'm sorry, go ahead, Your Honor.

THE COURT:  No, I was just going to say you have all the remedies of, you know, something that has not been produced in discovery cannot be used at summary judgment, trial or elsewhere in the case. And so that all the remedies that apply under the rules to nonproduction of documents are applicable here.

THE PLAINTIFF:  Your Honor, may I speak?

THE COURT:  Go ahead, yes.

THE PLAINTIFF:  Thank you.  I have in front of me plaintiff's August 30th deposition responses which I emailed to the plaintiff, or dropped off in person. I have dated October 24th notarized all my responses to Supplemental Rule 37.  As far as my evidence that was sent on October 24, 2022, from number 389 to 494, it's been notarized, everything has been meticulously spelled out and labeled.  Then I also have dated October 24th, 494 up until 593, from 612 into the 700s, all that, all those documents are labeled.

44

I will say this, that in reviewing some of the requests, one in particular that's very important is the defendants stating that I never gave medical records. So in reviewing my numbers, evidence 179 to 184 is physical therapy appointments from 2015 to 2018 and what is incorrectly stated in all letters to the Court is the office visits which are duly listed and the treatment within the office visit is listed, and that's from 185 to 190.

The last thing I am going to state is that within this whole case, some of the documents that I have, and most of them are printouts from the internet, it was one of two pages and on the secondary page it was insignificant information that wasn't relative. So a lot of the requests that only have the one page or two pages are items that I did not keep. And one of the reasons why I didn't keep them is because once, in 2016, once that internet post was taken down I saved some information but basically chucked a lot of it away. I never thought I would have to continue to, when it resurfaced I didn't know that I had to continue.

So just because there is one minor deletion I, as a pro se litigant, don't know why that information

is necessary if there's such menial forms of information on the page. I've explained that, I've answered --

THE COURT: I understand. I understand --

MS. HAIMSON: If I may, Your Honor --

THE COURT: The better course would have been to produce both pages, but if you don't have, you know, the second page, you don't have the second page.

THE PLAINTIFF: I don't have it, just like the defendants stated we don't have that information.

THE COURT: Okay, go ahead Ms. --

MS. HAIMSON: If I may, Your Honor, so in regards to the incomplete documents, so we've asked repeatedly for you just to confirm whether you have it or not. If you don't have it, you don't have it. But you --

THE PLAINTIFF: I just said one page, submitted one page. So how, how would you have liked me to phrase it?

MS. HAIMSON: We would like you to formally respond where we tell you, for example, that you're missing page two of a document, to simply say that it's not in your possession so that we know that it is not. Rather than that you have it in your possession,

46

you've decided without giving us the opportunity to review it and determine whether we think it's relevant but you decided it is irrelevant and menial, as you say, and that you've discarded it and/or are intentionally withholding it.  If you don't have it, you don't have it, you can't be compelled to produce anything you don't have, but we have the right to know what is in your possession. You've produced partial parts of documents and to the extent that you're in possession of the full document, we're asking for the full document which is a perfectly reasonable request. If you don't have it, that's also fine, but we have the right to know that information.

THE COURT:  Ms. Haimson, the list in number 6 on page 2 of your letter, are those the documents where you're looking for confirmation about whether there are pages missing or not or is there some other list of documents?

THE PLAINTIFF:  There's exhibit A and exhibit C --

THE COURT:  I'm asking Ms. Haimson.

THE PLAINTIFF:  I'm sorry.

THE COURT:  The list of documents that you want to know whether or not she has any other pages

47

from, is that number 6 on page 2 of your letter?

MS. HAIMSON:  Yes, I believe that's correct, Your Honor, yes.

THE COURT:  All right. So, Ms. Trombetta, please look at number 6 on page 2 of their letter --

THE PLAINTIFF:  Wait a minute, there's three letters, there's one from October --

THE COURT:  309 dated November 7th.

THE PLAINTIFF:  I only have November 7th letter, number 6, the following documents, okay, so the only thing, I can go through each and every one of them, most of them --

THE COURT:  No, no, you don't need to do it right now, I'm not letting you do it right now because we need --

THE PLAINTIFF:  (indiscernible) those documents that are there, are produced, but there's only one of two pages and most of those documents are the Google printouts from 2015 to 2017. So everything that's highlighted there is usually just one page.

I will say this, in going through some of the information, I did find the printer, the formal printer in my building did it double sided. So number 611 and 612, 612 is -- is the way in which I know that

48

there's insignificant information on --

THE COURT:  I don't need to know on this call. What I'm asking you to do, Ms. Trombetta, is look at number 6 of ECF number 109 and go through that and let Ms. Haimson know by the end of next week whether there are any additional pages that you have or if those are, or if you've produced everything that you have for those documents.

THE PLAINTIFF:  I will do it again but I've already sent that on October 24th and listed, I'm looking at it right now, number 51B, number 52, number -- all of it.

THE COURT:  Okay, you don't need to go through it all.  Ms. Haimson, do you have the October 24th email?

MS. HAIMSON:  I do.

THE COURT:  Does that answer your question then?

MS. HAIMSON:  No, I believe that these are still outstanding requests.

THE COURT:  All right, so I don't have time to parse through it all here so what I'm asking you to do after this call, Ms. Trombetta --

THE PLAINTIFF:  I will do it again, I promise.

49

THE COURT:  Okay, thank you.

THE PLAINTIFF:  Number 6 --

MS. HAIMSON:  There's a few other items that are outstanding, we can just try to go through those as quickly as possible, I know that Your Honor's time is precious here.

THE COURT:  All right, go ahead.

MS. HAIMSON:  So request number 12 from our deposition demands, we sought documents and communications showing all artwork sales plaintiff has made from 2017 to present.

THE COURT:  Okay.

MS. HAIMSON:  It's my understanding that she is in possession of additional sales records, above and beyond what we've received. We only received very minimal documents.

THE COURT:  Okay.

THE PLAINTIFF:  The receipts that I have -- it's a burden, Your Honor, and it's an invasion of my privacy.

THE COURT:  You brought this case, Ms. Trombetta, you brought this case --

THE PLAINTIFF:  That sounds really --

THE COURT:  They're entitled to defend

50

themselves. They're entitled to defend themselves. If you have other sales records that go to the extent of damages you can claim in this case, they're entitled to have it. I'm sorry if it's burdensome, but --

THE PLAINTIFF:  The extent of the damages and the evidence that I have provided is within the range of the years that this occurred.

THE COURT:  But what other --

MS. HAIMSON:  Ms. Trombetta, you can't cherry pick which documents you think are representative of the value of your paintings, you have to, we're requesting things that show the extent of any damages that you suffered.  You have to produce all these records.

THE PLAINTIFF:  I provided --

MS. HAIMSON:  You brought this lawsuit against my clients.

THE PLAINTIFF:  We're in a disagreement because I have provided that information and you won't --

THE COURT:  Which years are we talking about --

THE PLAINTIFF:  (continuing) -- accept the fact that I have provided you this information, you

keep asking me over and over again.

MS. HAIMSON:  I believe you've only provided one sale but, regardless, if there are additional sales, you haven't confirmed whether there are additional sales and that you've produced all the sales documents that you have. It seems like even from what you're saying in this conference that you don't want to do so because you feel it's burdensome, not because you don't have additional records.

THE PLAINTIFF:  No --

THE COURT:  What is the relevant time period, Ms. Haimson, just remind me?

MS. HAIMSON:  2017 to present.

THE COURT:  Okay. So, Ms. Trombetta, since 2017 how many paintings have you sold?

THE PLAINTIFF:  I don't -- in 2017, because it was on the internet, it was only one, I provided that information.

THE COURT:  Okay, what about, what about 2018, how many paintings did you sell?

THE PLAINTIFF:  I -- I don't recall and I would have to look up my records. I know that this year I only sold one because the whole year has been revolving around this lawsuit.  I did not do this

52

painting, I have proven that. If I didn't produce --

THE COURT:  What you're saying is that because, what you're saying in this case, Ms. Trombetta, is because of what the defendants did, you have not been able to sell other paintings. And this issue goes to your damages. So if you've been able to sell paintings or not, that's information that the defendants need to know because it impacts whether or not you've been damaged.

THE PLAINTIFF:  I understand what it is that you're stating, I gave the information for 2000, I believe it was '14, '15, '16 and '17, this was the time that the, 2015 to 2017, I've already produced the sales or the lack of sales.  Again, in 2017 I only was able to sell one very small painting.

THE COURT:  All right, but we need to know 2018, 2019, 2020 and '21.

THE PLAINTIFF:  But why is that, because it came off the internet?

THE COURT:  Because what you've alleged in this case is what defendants did has impacted your ability to sell your other paintings since then.

THE PLAINTIFF:  What I said was it diminished the value of -- I lost a sale in 2015, I've never been

53

shy about bringing that to the Court's attention.

THE COURT:  I know.

THE PLAINTIFF:  I haven't stated that, Your Honor. I did produce from 2015 to 2017 the decline --

THE COURT:  Okay, are you disclaiming any damages since 2017?

THE PLAINTIFF:  Am I disclaiming any damages?

THE COURT:  Are you saying that what defendants did, did not impact you in 2018, 2019, 2020 and 2021 and 2022?

THE PLAINTIFF:  Well when this lawsuit commenced in 2018, and this year has precluded me from being able to actually actively sell my work --

THE COURT:  That's different --

THE PLAINTIFF:  And I also, I produced the one and only sale that I made in --

THE COURT:  Let me make this clear to you, Ms. Trombetta, if you do not produce any records of sale for 2018 through 2022, you will not be able to claim or seek any damages from defendants for that period.

THE PLAINTIFF:  Well I'm claiming statutory damages which are, to my knowledge, linked into the violations. That's what I'm claiming, Your Honor. I have specifically repeated that statement, statutory

54

damages.  So, and I have asked a retired attorney about this.

THE COURT:  All right, well if that's the case and you're disclaiming any attempt to recover any additional amount --

MS. HAIMSON:  Or actual damages, but I believe actual sales are still important to the analysis for statutory damages as well.

THE PLAINTIFF:  Well if you believe it I need to confirm it. You know, a belief is not, I'm the person who should be saying believe or not.

THE COURT:  Well, I mean --

THE PLAINTIFF:  Because I'm a pro se litigant.

THE COURT:  Ms. Trombetta, so --

THE PLAINTIFF:  I don't mean to be difficult, Your Honor --

THE COURT:  If you want to limit the amount of damages that you may be able to recover, that's fine, and if you do that by, you know, the impact of not producing documents for a particular period may mean that your recovery is limited if not precluded altogether. So I just want to make sure you understand the consequences of refusing to produce information about sales from 2018 through 2022.

55

THE PLAINTIFF:  I've produced 2014, 2015, 2016 --

THE COURT:  I understand.

THE PLAINTIFF:  And 2022, because these are years which have been, that were directly affected by the false posting on the internet, and this year, in particular, it has precluded me from being able to sell my work.

THE COURT:  All right, so you are not claiming any damages for 2018, 2019, 2020 and 2021, correct?

THE PLAINTIFF:  That, let's -- yes, that is correct.

THE COURT:  All right, so you have it, Ms. Haimson, no damages for 2018, 2019, 2020 and 2021.

THE PLAINTIFF:  It is specific to that particular posting and how it affected the drop in sales as soon as it was posted.

THE COURT:  All right, Ms. Haimson, anything else on your list?

MS. HAIMSON:  Thank you, yes.  Request number 13 about post deposition demands. We want written confirmation as to whether she's seeking damages for physical harm. The complaint, itself, references emotional distress, she has represented during her

56

deposition, as well, that she suffered some exacerbation of certain medical conditions due to the lawsuit and due to alleged actions by my client and the EIA defendants.  I'm not sure whether she actually is seeking those damages, we want confirmation about that, but to the extent that she is, in terms of medical records all we received are billing statements, we have not received any sort of authorizations which let us know in any way all the providers that she has sought and what treatment she has received for any such injuries or damages that she sustained.

THE COURT:  Which number is this?

THE PLAINTIFF:  May I respond to that, Your Honor?

THE COURT:  Just a second, yes, just let me --

MS. HAIMSON:  It's page 4 of exhibit A.

THE COURT:  Just tell me the number.

MS. HAIMSON:  It's request number 13, so written confirmation as to whether she is seeking damages for alleged physical harm and then there's a couple of requests that follow if she is.

THE COURT:  All right, Ms. Trombetta, are you seeking physical damages?

57

THE PLAINTIFF:  I was asked in February to produce, because the original complaint with EAI I had listed that, Mr. Duff had requested me to produce that and I already have. Now at the beginning of the conversation or in the middle of our discussion I had mentioned office visits, evidence 179 to 184. Those are physical therapy appointments and records with the amount for the visit. Again, number 185 to 190 are the office visits that I --

THE COURT:  Right, but you're not answering my question.  You're not answering my question, my question is are you seeking damages for any physical impact as a result of the defendants' conduct, yes or no?

THE PLAINTIFF:  At this time I am. I believe I'm going to, if I do the proposed amended complaint, add to that, but I've already produced documentation --

THE COURT:  It sounds to me that what you have produced is not sufficient. So but we'll do, Ms. Haimson, is I'm going to hold this in abeyance until we see the amended complaint and then we'll reassess what, if any, medical records Ms. Trombetta needs to produce.

58

THE PLAINTIFF:  And that's exactly what I stated, Your Honor. I did state that in my reply, I can find it and read it to you --

THE COURT:  I cannot keep track, there are ten letters that came in for this conference, I cannot keep track of what everybody says, this isn't my only case I handled today, obviously, I'm trying to do my best.

THE PLAINTIFF:  I'm sorry, Your Honor --

THE COURT:  What else is on your list?

THE PLAINTIFF:  I keep trying to do my best. It's number 13 of --

THE COURT:  No, no, we're done with that one, I'm asking Ms. Haimson what else is on her list.

THE PLAINTIFF:  Got it.

MS. HAIMSON:  Next on the list is for, so if you look at exhibit B, page 5, it's request number 13 from our -- hold on one second, from our supplemental Rule 37 letter. So essentially seeking plaintiff's tax returns from 2010 to present, again pertaining to what damages, if any, and what income, if any, she's had since she says the defendants violated her copyright.

THE COURT:  Has she produced any tax returns?

MS. HAIMSON:  I believe she only produced a

narrative regarding her income from the year 2022. And I think there was also maybe a tax return from the year 2000 and the year 2003, but certainly nothing that's contemporaneous with this posting, so, no.

THE COURT:  All right, Ms. Trombetta, do you have tax returns for 2010 to the present?

THE PLAINTIFF:  I have consulted with three attorneys on this, I am seeking statutory damages and do not wish to produce my taxes.

THE COURT:  All right, without representation, Ms. Haimson, do you need the tax returns?

MS. HAIMSON:  So is it your contention, Ms. Trombetta, that you are waiving all claims to any actual damages at all in this lawsuit?

THE PLAINTIFF:  The actual damages is the proof of the loss of the sale for $8,500, that's the only actual damage I am going to claim, everything else is going to be statutory damages.

THE COURT:  All right, so you're waiving --

MS. HAIMSON:  I believe you have to choose one or the other pursuant to the Copyright Act.

THE COURT:  All right, but in any event, whether or not that's the case, any actual damages she's agreeing, Ms. Trombetta, you're agreeing not to

60

seek any more than $8,500, correct?

THE PLAINTIFF:  For the actual damage that I know of that I can prove, it was the loss of the sale. All other damages are linked to the violations of the (indiscernible) Act, the Copyright Act and the DMCA 1202(a) and 1202(b). I put that in the Rule 26 documents in February --

MS. HAIMSON:  If you're seeking any damages under any other statute, as well, again, those, those income records are essential. So if you're only claiming statutory damages in theory, I think we're probably okay with you not producing your income records. But if you're seeking any damages related to loss of income, it's our position that we have the right to know what your income was.

THE COURT:  Ms. Trombetta, are you claiming any lost income under any theory in this case?

THE PLAINTIFF:  The loss of sales was applicable to the dates -- statutory damages and the actual sale of the painting, Your Honor.

THE COURT:  All right, you're not seeking any other damages beyond that in this case under any theory?

THE PLAINTIFF:  I'm going to say no.

61

THE COURT:  Okay.

THE PLAINTIFF:  Just the statutory damages and the loss of the sale.

THE COURT:  All right, so with that, I mean the other way to deal with this, Ms. Haimson, you have that representation, we also have an amended complaint coming, so that could, that could change what you may or may not need to request, right?

MS. HAIMSON:  That's fine, Your Honor, thank you.

THE COURT:  So I'm going to deny the request for the tax returns without prejudice.

THE PLAINTIFF:  Okay.

MS. HAIMSON:  Thank you.  And the only other outstanding issue I believe is communications with nonparty witnesses.

THE COURT:  Okay.  Do you have any that have been produced?

THE PLAINTIFF:  So, Your Honor, as a pro se litigant I did discuss with my witnesses and my witnesses agreed to be witnesses sometime in August and I believe what the defendants are trying to obtain are emails and even text messages. I don't have text messages, I don't have that many emails --

62

THE COURT:  Do you have emails -- what are the names of these people, how many are there?

THE PLAINTIFF:  There's three fact witnesses which have been deposed.

THE COURT:  Have you communicated with any of them in writing?

THE PLAINTIFF:  Have I communicated with any of them in writing regarding this case?

THE COURT:  Yes.

THE PLAINTIFF:  Very minimally.

THE COURT:  Then you need to produce it.  That is not privileged, you're not an attorney, it's not privileged, it needs to be produced.

THE PLAINTIFF:  But, Your Honor, I am self-represented --

THE COURT:  You're not an attorney, there is no attorney-client relationship between you and those witnesses.

THE PLAINTIFF:  I understand, Your Honor, there's very little communication --

THE COURT:  It doesn't matter, you need to produce it. You need to produce it.

THE PLAINTIFF:  Please understand that. I will produce --

63

THE COURT:  I don't care how much it is, it needs to be produced.

THE PLAINTIFF:  Understood.

MS. HAIMSON:  And we would also request that those communications not just be limited to specifically discussions about, you know, and in preparation of their deposition, but it would be any communications --

THE COURT:  Anything about this case.

MS. HAIMSON:  Your artwork or your biography as well.

THE COURT:  Anything relevant to this case.

THE PLAINTIFF:  Anything relative to this case, I don't mean to burst your bubble, but there's not much.

THE COURT:  It doesn't matter, just produce it.

THE PLAINTIFF:  No, I'm just letting you know, Your Honor.

THE COURT:  Fine.  Okay, anything else, Ms. Haimson?

MS. HAIMSON:  Not at this time, Your Honor, thank you.

THE COURT:  All right, if I could ask the

64

defendants to please order a transcript of today's conference.  Ms. Trombetta, is there anything else you wanted to raise today?

THE PLAINTIFF:  It has been a full day. So because I'm dealing with other people, meaning the expert witnesses, and we're approaching the holiday season, if for some reason they cannot submit a report by December 12th, what --

THE COURT:  You need to make --

THE PLAINTIFF:  Can I ask for an extension for them?

THE COURT:  Yes.

MR. DUFF:  Your Honor, we object, this is Anderson for defendants --

THE COURT:  I know --

MR. DUFF:  I'm sorry?

THE COURT:  I know, but she can make an application and I'll --

MR. DUFF:  Okay, yes, Your Honor, thank you.

THE COURT:  I'm not going to prejudge it, but because it sounded like a hypothetical, so maybe we won't. You also have a deadline to file your motion for leave to amend and your proposed amended complaint on December 12th, Ms. Trombetta.

65

THE PLAINTIFF:  I understand, thank you for the reminder, Your Honor.

THE COURT:  All right, anything else then from you, Ms. Trombetta?

THE PLAINTIFF:  Well I might add this to propose the idea of a settlement conference, is that something that the defendants would be interested in at this time?

THE COURT:  Mr. Duff, I'll start with you?

MR. DUFF:  Your Honor, my clients are not interested in a settlement conference, we've already had several in this case and I know the Court has bent over backwards trying to accommodate settlement conferences. Every time we do that it just extends the inevitable conclusion of this case and the plaintiff's, the plaintiff's valuation of this case is just so far away from our client's valuation of this case that we do not believe a settlement conference would be, it would just be a waste of our client's resources and it would further delay the conclusion of this case.  Thank you, Your Honor.

THE COURT:  Okay, Ms. Haimson, what's your client's position?

MS. HAIMSON:  Yeah, we echo the same

66

sentiment, I don't think that it would be fruitful at this time, thank you.

THE COURT:  Okay. All right, well I can't force anybody to come to a settlement conference, Ms. Trombetta. I mean you're certainly welcome to make an offer to them and see if they'll respond and if, you know, it looks like that might be productive, then you guys can let me know, you know, if anybody's mind changes about that, but at the moment it looks like a settlement conference is not going to be a productive use of our time.

THE PLAINTIFF:  Well I just want to ask when was there a settlement conference? There was one scheduled in March and it was cancelled.

THE COURT:  I think he's referring to your settlement discussions, not --

MR. DUFF:  No, Your Honor, sorry, I did not mean to cut Your Honor off, but I'm referring to the two conferences, settlement conferences that Judge Abrams presided over in her chambers at the beginning of this case trying to settle this matter before it got to this stage. And we've made an offer of judgment and we've exchanged several settlement -- I'm specifically referring to Judge Abrams' two settlement

67

conferences that she hosted in person quite graciously early on in this case.

THE COURT:  Right, okay.  I was not there for those.

MR. DUFF:  That's correct, Your Honor, I'm sorry, you would have no way of knowing that, but yes.

THE COURT:  Okay.  All right, okay, we will do an order that memorializes what was discussed today and, as I said, if the defendants could please order a transcript as well. I wish you all a very happy and relaxing Thanksgiving.

THE PLAINTIFF:  You, as well, Your Honor.

THE COURT:  We'll be adjourned. Thank you so much.

(Whereupon the matter was adjourned.)

68

C E R T I F I C A T E


I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, Trombetta versus Novocin, et al., Docket #18cv993, was prepared using digital electronic transcription equipment and is a true and accurate record of the proceedings.


Signature _____*Carole Ludwig*_____

CAROLE LUDWIG

Date:  December 8, 2022